IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

AMIR JAMEL KHAN,

               Plaintiff,

  v.

LOGEN LATHROP, KASSANDRA KIMBLER,
JERRI EVANS, KURT HOEPER, MATTHEW HANKE,
RICKY STILWELL, and GARY TROSTORFF,

               Defendants.

OPINION and ORDER

19-cv-979-jdp

---

Plaintiff Amir J. Khan, appearing pro se, is a prisoner at Wisconsin Secure Program Facility. Khan alleges that shortly after midnight on July 30, 2019, defendant prison officials failed to promptly address his threats of suicide, allowing him to overdose on medication. Khan brings Eighth Amendment claims against officials who he says failed to intervene to help him at various points of the incident. He also brings a state-law negligence claim against an officer who responded to an emergency call about the suicide attempt by sending support staff to the wrong location.

Both sides filed motions for summary judgment. Dkt. 24 and Dkt. 29. I directed them to supplement their briefs after my review showed that they might not have fully joined the issues necessary to resolve the case. Dkt. 60. The summary judgment motions are now fully briefed. There are genuine disputes of material fact regarding whether defendant correctional sergeant Logen Lathrop disregarded Khan's threats to harm himself as Lathrop conducted inmate count at the beginning of the events in question, so the case will proceed to trial on an Eighth Amendment claim against Lathrop. But Khan fails to show that any of the other defendants disregarded the risk of harm he faced. And Khan's negligence claim fails because he

did not comply with Wisconsin's notice-of-claim statute. I will grant the remainder of defendants' motion for summary judgment, and I will deny Khan's motion for summary judgment in its entirety.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

Plaintiff Amir J. Khan is a prisoner at Wisconsin Secure Program Facility (WSPF). Khan was housed in cell 409 in Alpha unit at WSPF. Defendants all worked at WSPF and were involved in the prison's response to Khan's suicide attempt. At the start of the events in question, defendants Sergeant Logen Lathrop and Officer Kassandra Kimbler were stationed in Alpha unit. Officer Jeri Evans was scheduled to work in Foxtrot unit that day but was performing health and wellness rounds on Alpha unit. Defendants Sergeant Matthew Hanke and Officer Ricky Stilwell were working in other units. Defendant Captain Kurt Hoeper does not say where he was working that night but I infer that it was not Alpha unit. Defendant Sergeant Gary Trostorff was working in the control center.

### 1. Defendant Lathrop's initial encounter with Khan

Overnight on the night of July 29, 2019, into the morning of July 30, Khan was locked in his cell, with his cell door closed but the vestibule door leading into the hallway open. Khan felt suicidal. Defendant Lathrop conducted inmate count around midnight. Khan says that as Lathrop walked by his cell, he knocked on his hallway window, got Lathrop's attention, and showed Lathrop a bottle of pills. Khan told Lathrop that he was suicidal and said, "I'm going to kill myself by taking these pills." Dkt. 27, ¶ 7. Khan says that Lathrop responded, "We're

not going to do this tonight, Mr. Khan," and walked away from his cell. *Id.*, ¶ 8. Lathrop denies that this conversation occurred.

Video footage from a vestibule camera captures only part of these events. It shows that Lathrop walked by Khan's cell twice at 12:01 a.m. The first time, Lathrop does not break stride as he walks down the hall. Dkt. 35-1, at 0:00–0:02. The second time, Lathrop walks by and appears to stop in the hallway and turn away from Khan's cell, with his back to Khan's cell. *Id.* at 0:23–0:26. But the vestibule camera captures only the portion of the hallway that can be seen through the vestibule doorway, so the video does not show whether Lathrop stayed in the hallway or addressed Khan or any other person.

### 2.  Defendant Evans's rounds

At 12:09 a.m., the vestibule door was closed. Around 12:30 a.m., defendant Evans conducted "health and wellness" rounds on Alpha unit, and she approached Khan's cell and spoke to him through his hallway window.[1] Some details of Evans's interaction with Khan are disputed, but it's undisputed that Evans saw Khan take a handful of pills. Khan says that when Evans approached his cell, he told her that he was suicidal. She stopped at his cell. Khan showed Evans a bottle of pills, again stated that he was suicidal, and started to ingest the pills. As Evans walked away from the cell, Khan continued to take the pills.

Because the vestibule door was shut, Evans could only observe Khan through the hallway window. Evans did not have a key for the vestibule door. Evans pushed the emergency

---

[1] None of the video captures these events other than the vestibule camera showing officers passing Khan's cell a few times between 12:31 and 12:33 a.m., and what appears to be an officer outside Khan's cell for about a minute at 12:33 a.m. Khan initially placed Evans's arrival at 12:15 a.m. But he does not dispute Evans's statement that she was at his cell at 12:33, it is clear from his other proposed findings that he is only estimating the times of the various events, and the exact timing of Evans's arrival is immaterial to his arguments at summary judgment.

call button on her radio and also used her radio to tell the control center that she was at cell 409, and report Khan's name and what she had observed.

Defendants do not fully describe the radio system for WSPF officers but I take them to be saying that the emergency call button emits an "alert tone" to all officers and sends the control center identification of the officer whose button was pushed and the unit to which that officer had been assigned. An officer also uses their radio to tell the control center more information about the emergency, and then the control center dispatches support officers to the site of the emergency.

Khan attempts to dispute that Evans pushed her emergency call button or radioed the control center to ask for help; he says that she walked way without helping him. But he concedes that multiple officers came to his cell soon after Evans said that she reported the incident. Khan doesn't provide an explanation for how this could have happened unless Evans reported the incident, so the only reasonable inference from the facts in the record is that Evans called for help.

### 3. Defendant Trostorff's dispatch

Defendant Trostorff was working in the control center and received the signal from Evans's emergency call button. Trostorff radioed for all "Team One" emergency responders to go to Foxtrot unit. Dkt. 32-1, at 2; Dkt. 74-1, at 2. Because Evans had been scheduled to work in Foxtrot unit, her equipment would have signaled to the control center that her emergency was coming from Foxtrot unit. Evans does not explain why someone assigned to Foxtrot unit would be on Alpha unit; Trostorff says that he did not know that Evans was helping to complete wellness rounds on Alpha unit. Trostorff does not explain whether he received Evans's call over

her radio that gave her location at cell 409 and Khan's name, or whether he wasn't listening to it. I will assume that Trostorff could have heard Evans's call.

### 4. Officers' response to Trostorff's call

Defendant Lathrop was near Khan's cell when Evans pushed the emergency call button; he says that he heard the alert tone and ran to the hallway outside Khan's cell.

Defendant Kimbler, who was working on Alpha unit, responded by going to the unit's sergeant cage to ask where defendant Evans was so that Kimbler could relieve Evans of the task Evans was performing and Evans could respond to the emergency on Foxtrot unit. (I infer that Evans was a "Team One" responder and that Kimbler was not.) The sergeant said that Evans was on Alpha unit, range 4. Kimbler arrived at Khan's cell and told Evans that she was needed on Foxtrot unit.

This caused Lathrop to realize that Trostorff's call was to the wrong unit; he radioed Trostorff to tell him that the incident was at Khan's cell in Alpha unit. Trostorff corrected the call to send support staff to Alpha unit. Defendants Hoeper and Hanke state that Foxtrot and Alpha units are across the hall from each other, only about ten yards apart, so Trostorff's initial incorrect dispatch delayed their response by at most a minute.

Khan says that while Lathrop and Kimbler stood outside his cell, he ingested more pills, but they did nothing to stop him.[2]

Lathrop retrieved wrist and leg restraints, and he and defendants Hoeper, Hanke, and Stilwell arrived at the vestibule. The vestibule video shows that they arrived at 12:34:35, about a minute and a half after the video shows an officer, presumably Evans, at Khan's cell. The

---

[2] Defendants erroneously respond to this fact by treating it as Khan's recounting of a later incident. I will accept Khan's account as undisputed.

vestibule door was opened. Hoeper entered the vestibule but did not open Khan's cell door; instead, Hoeper spoke with Khan through his cell door window. Hanke and Stilwell stayed in the hallway.

Defendant Kimbler's bodycam video shows Hoeper speaking with Khan through the cell door window. Dkt. 32-2. Hoeper's side of the conversation is audible; Khan cannot be seen on the footage and his side of the conversation was not recorded well enough to be intelligible. The video shows Hoeper asking Khan what happened and what he ingested, stating that it looked like Khan had a bottle of acetaminophen, and then asking him how many pills he took and stating that he will have to go to the hospital. *Id.* at 0:02–0:34. Hoeper finishes the conversation by telling Khan to "hang tight," that staff would get him ready, and then Hoeper would come back to get him. *Id.* at 0:42–0:46.

Hoeper, Hanke, and Stillwell left the area to contact the on-call nurse and arrange for transportation to the emergency room. Kimbler remained at Khan's cell front to watch him.

### 5. Defendants Lathrop and Kimbler's watch

Kimbler's bodycam video shows that Khan sat quietly in his cell. Kimbler asks Khan through the cell window door how he was doing, with Khan not responding. *Id.* at 1:18–1:19. About 30 seconds later, Lathrop enters the vestibule with restraints; Kimbler and Lathrop engage in some small talk and Lathrop exits the vestibule, as Khan continues to sit quietly. *Id.* at 1:50–2:07. About a minute and a half later, Khan reaches for something; Kimbler says, "Hey, what are you doing?" and "No no no no no, don't" as Khan swallows more pills. *Id.* at 3:27–3:30. Lathrop reenters the vestibule, inserts his key into the cell door and tells Khan not to take any more pills or he would have to use force. *Id.* at 3:30–4:12. Lathrop asks Khan to put the lid back on the bottle; the video does not capture what Khan did but Lathrop's

6

response indicates that Khan complied, and Khan does not dispute this. *Id.* at 4:15–4:23. It is undisputed that Khan did not ingest any more pills during the incident. Lathrop and Kimbler stay outside the cell door for about eight more minutes until defendant Hoeper returns to extract him from the cell and take him to the hospital.

**6. Khan's treatment**

Khan was taken to the hospital, where he was given activated charcoal and an intravenous drip. The hospital record says that Khan reported taking 36 pills of acetaminophen-aspirin-caffeine and that he denied nausea, vomiting, abdominal pain, or palpitations. Khan disputes this, saying that he took more pills than 36—although he does not explain how many—and that he told hospital staff that he was experiencing nausea, lightheadedness, and dizziness. But because Khan reported that he had overdosed on aspirin or acetaminophen, his ibuprofen levels were not checked.

Khan's acetaminophen and salicylate (aspirin) levels were within normal levels so he was discharged back to WSPF about six hours after his admission. Khan says that he vomited more than once upon his return to WSPF. His mental health treatment notes confirm that he was observed vomiting.[3] Dkt. 47-3. Khan says that he "still experience[ed] epigastric distress and abdominal pain." Dkt. 79, ¶ 26. Khan also says that he experienced rectal bleeding at some point after the incident.

---

[3] As part of his supplemental summary judgment materials, Khan filed a motion for the court to take judicial notice of several attached documents, including proposed findings of fact he had previously submitted, medical records, and an opinion by this court in another prisoner case. Dkt. 67. I will deny the motion because this court doesn't need to take judicial notice of its previous opinions to consider what is said within them, and the other documents he submits are materials not appropriate for judicial notice. I will consider those documents as evidentiary materials along with the rest of the parties' submissions in support of the cross motions for summary judgment.

ANALYSIS

## A. Video evidence

I allowed Khan to supplement his complaint after defendants' initial summary judgment briefing suggested that part of the delay in extracting Khan from his cell was caused by an unnamed "control sergeant" who mistakenly sent support officers to the wrong unit. Dkt. 60, at 1–2. Khan amended his complaint to include a claim against the control sergeant. Dkt. 61. He also attempted to add claims against Mark Kartman, the facility security director, who Khan says destroyed video evidence of defendants' interactions with him.

I did not allow Khan to proceed on claims against Kartman, but I stated that I could consider whether Khan would be entitled to sanctions or an inference that the recording contained evidence supporting his claims. *See* Dkt. 62, at 2–3 (citing *Bracey v. Grondin*, 712 F.3d 1012, 1019–20 (7th Cir. 2013) (bad-faith destruction of video surveillance to hide adverse information could support sanctions or inference that recording contained evidence supporting plaintiff's claim)); *see also* Fed. R. Civ. P. 37(e) (court may sanction party that intentionally fails to preserve electronically stored information to deprive opponent of the information's use). I directed the parties to address this issue in supplemental summary judgment briefing. Dkt. 62, at 2–3.

In their supplemental summary judgment materials, the parties do not dispute Khan's efforts to obtain footage of the events.[4] About a week after the incident, Khan sent an

---

[4] Khan argues that defendants are concealing hallway footage from him and the court, yet are using it in their own summary judgment submissions to support their arguments that defendants Lathrop and Evans acted appropriately. Khan misunderstands defendants' position; they use vestibule-camera footage (which captures part of the events in the hallway) to support their arguments regarding Lathrop and Evans, not hallway footage that they say has been destroyed.

"Interview/Information Request" form stating in relevant part: "Can you preserve the camera video/film from the hallway and [vestibule] from the night of my [suicide] attempt July 30th 2019?" Dkt. 77-1. Kartman says that this wasn't a detailed-enough explanation; he responded to Khan, stating, "More specific information is required for video preservation. Which hallway/vestibule times requested." *Id.* Khan did not immediately reply to this message. Instead, about four months later, he sent a second request stating, "I need you to hold and reserve the video from my suicide attempt on 7-30-19. I need the footage for 400 range 3rd shift. I am gonna need the video from the vestibule as well because it pertains to my case!!! Please let me know something soon." Dkt. 77-2. Kartman responded by stating, "The vestibule video was previously preserved. The range video is no longer available." *Id.*

According to Kartman, the reason that vestibule footage was preserved but not hallway footage is that the recording system would tape over old footage after reaching capacity, and the motion-activated hallway camera recorded activity more often than the motion-activated vestibule camera, so old footage on the hallway camera would more quickly be recorded over. He says that he preserved the vestibule footage because of Khan's second request.

Defendants' response is inadequate. Kartman's statement that he preserved the vestibule footage because of Khan's second request is contradicted by his response to Khan's second request stating that the vestibule footage was "previously preserved." Defendants otherwise provide no evidence of when the vestibule footage was preserved, why it was preserved, or who preserved it. Khan's first request lacked specifics and he failed to promptly respond to Kartman's request for more information. But the fact that the vestibule video was preserved anyway suggests that Kartman or other officials were aware that, following an inmate's suicide attempt generating multiple officer incident reports, they had the obligation

to preserve relevant footage in anticipation of litigation. That raises the question why the hallway video wasn't also preserved.

Without more evidence, I cannot conclude that prison officials demonstrated bad faith by allowing the hallway footage to be destroyed. That does not matter for purposes of summary judgment, because I will accept as true Khan's firsthand account of his interactions with prison officials during the events in question. But because one of Khan's claims survives to trial, it is necessary to obtain more evidence about the destruction of the hallway video so that I can determine whether sanctions are appropriate. Accordingly, I will hold a hearing on the destruction on the hallway video, at which defendants will be expected to call as witnesses Kartman or other officials responsible for (1) the decision not to immediately act to preserve the hallway video; and (2) the decision to preserve the vestibule video, whenever that decision was made.

## B.  Khan's claims

Khan contends that each of the defendants violated his rights under the Eighth Amendment to the United States Constitution by failing to promptly intervene in his attempts at self-harm. The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). This includes "an obligation to intervene when [prison officials] know a prisoner suffers from self-destructive tendencies." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012); *see also Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001). To state an Eighth Amendment claim against a defendant, Khan must allege that the defendant was aware of a substantial risk of harm and consciously failed to take reasonable measures to help him. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015).

### 1.  Defendant Lathrop's initial encounter with Khan

Khan argues that defendant Lathrop violated his Eighth Amendment rights because he explicitly warned Lathrop during count that he was going to harm himself by overdosing on medication and Lathrop blew him off, stating, "We're not going to do this tonight, Mr. Khan." Lathrop denies that Khan told him about his thoughts of self-harm, and defendants say there is not a genuine dispute of material fact about whether Khan and Lathrop had this conversation because the video evidence disproves Khan's version. Defendants say that the vestibule video shows that Lathrop walked down the hallway past Khan's cell twice without stopping or saying anything to him.

But the video does not decisively support defendants' version of events. There is no audio included with the vestibule video, so it's impossible to tell whether Khan and Lathrop said anything to each other. The video shows Lathrop walking quickly past Khan's cell on his first pass, and on Lathrop's way back it appears as if he stops near Khan's cell and perhaps turns to face away from Khan's cell. This suggests that Lathrop interacted with someone or something on the opposite side of the hallway, not Khan. But the video doesn't definitively show that to be the case. And Lathrop quickly disappears from the view of the vestibule camera because that camera captures only the portion of the hallway visible from inside the vestibule; there's no way to tell if Lathrop interacted with Khan while Lathrop was off camera. Without conclusive video evidence showing what happened between Lathrop and Khan, we are left with a genuine dispute over whether Khan warned Lathrop that he was going to harm himself and Lathrop did nothing.

Defendants argue that this dispute isn't material because no matter what happened between Lathrop and Khan, Khan didn't actually face a substantial risk of harm and he indeed

wasn't harmed by the medication he consumed. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("risk is not compensable without evidence of injury"). In his complaint and his own motion for summary judgment, Khan contended that he swallowed significant amounts of either aspirin or acetaminophen. Defendants relied on that in procuring expert testimony interpreting Khan's medical records to address the question whether he was actually harmed by those particular medications. *See* Dkt. 21. But in his later filings opposing defendants' motion for summary judgment and supporting his own motion, he said that the pills he swallowed must have been ibuprofen, because the lab results showed elevated glucose and creatinine levels. Dkt. 36-1, at 14. I had the parties address Khan's new theory of harm in their supplemental summary judgment briefing.

Khan contends that the emergency room lab results show that his kidneys were injured by his overdose: the results showed elevated glucose and creatinine levels. Defendants provide a declaration from Narendra Kuber, a pharmacist who works as the assistant pharmacy director and acting pharmacy director of the DOC's Central Pharmacy Service. Kuber states that Khan did not ingest a toxic amount of ibuprofen. Kuber says, "In general, ingestion of less than 100 mg/kg [of ibuprofen] is unlikely to cause significant toxicity." Dkt. 71, ¶ 8. Given Khan's weight, that amount would be 10,300 mg of ibuprofen, or 41.2 tablets of 250 mg ibuprofen. The emergency room records state that Khan reported taking 36 pills. Kuber also notes that the symptoms of acute ibuprofen overdose "tend to be minimal" and are nausea, vomiting, drowsiness, blurred vision, and dizziness, but that the emergency room records state that Khan did not report those symptoms. *Id.* at ¶¶ 8, 14. Kuber notes that it is unlikely that the glucose and creatinine readings were caused by an overdose of this size, and that in any event Khan's

glucose level would not be expected to cause him harm and the elevated creatinine level could be treated and reversed.

Khan's lab results alone are not enough to support a reasonable inference that he was harmed. Kuber's report doesn't definitively state that it would be impossible for Khan's ibuprofen overdose to cause those lab readings, but it isn't defendants' burden to disprove that assertion. It is Khan's burden to present enough facts to show that the ibuprofen caused those lab results, and he does not have the expertise to say that they did. Khan's mere speculation that his glucose and creatinine levels were caused by the overdose does not raise a reasonable inference that his overdose was the cause. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

But Khan has more evidence of harm than just the lab results: he says that he vomited and experienced epigastric distress, abdominal pain, and rectal bleeding. The onset of those symptoms several hours after the overdose raises a reasonable inference that those symptoms were caused by the overdose. Kuber suggests that Khan did not ingest a toxic amount of ibuprofen based on calculations of the amount that would be toxic and the lack of self-reported symptoms associated with ibuprofen overdose. But Khan says that he swallowed "[far] more" pills than the 36 mentioned in the emergency room report, Dkt. 81, ¶ 28, he disputes the part of the report stating that he did not alert staff to his nausea, lightheadedness, and dizziness, and he says that he suffered other symptoms upon his return to WSPF such as vomiting and abdominal pain.

Kuber states that "ingestion of less than 100 mg/kg is unlikely to cause significant toxicity"; I infer that ingestion of more than that amount could be toxic. By Kuber's calculations, 36 ibuprofen tablets would have brought Khan to within nearly 90% of the toxic-overdose threshold. And although Khan at no point explains exactly how many pills he took, it is clear that he believes he took more than 36, and he indeed suffered symptoms consistent with a toxic overdose. Therefore Khan has established a genuine dispute of material fact over whether he was harmed by the overdose.

Defendants also contend that they are entitled to qualified immunity, which applies unless, under the plaintiff's version of the facts, the law at the relevant time was clearly established that the defendants violated the plaintiff's rights. *Carroll v. Carman*, 574 U.S. 13, 16 (2014). They contend that Khan cannot point to precedent supporting Eighth Amendment claims similar to his because he didn't alert defendants that he was suicidal, he wasn't harmed, and that "it is unquestionable that defendants acted promptly upon being aware of Khan's suicidal ideation." Dkt. 30, at 15–18.

But I have already concluded that there are genuine factual disputes about each of these issues: Khan says that he explicitly warned Lathrop that he was going to harm himself by overdosing on medication, that Lathrop disregarded the warning, and that Khan was harmed by the overdose. This leaves a fairly common Eighth Amendment claim about a prison official disregarding a risk of self-harm. The court of appeals has rejected similar claims of qualified immunity in other cases involving a prisoner's self-harm. *Estate of Clark v. Walker*, 865 F.3d 544, 551–52 (7th Cir. 2017) ("[The prisoner's] right to be free from deliberate indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012."); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003) ("[T]he right Mrs. Cavalieri

14

asserts on behalf of Steven is the right to be free from deliberate indifference to suicide. There is no doubt that this right was clearly established prior to Steven's suicide attempt."); *Hall v. Ryan*, 957 F.2d 402, 404–05 (7th Cir. 1992) ("It was clearly established in 1986 that police officers could not be deliberately indifferent to a detainee who is in need of medical attention because of a mental illness or who is a substantial suicide risk."). Defendants are not entitled to qualified immunity, and neither party is entitled to summary judgment, so this claim against Lathrop will need to be resolved at trial.

### 2. Defendant Evans

Khan contends that defendant Evans violated his Eighth Amendment rights by doing nothing after he ingested at least a handful of pills in front of her. The parties dispute parts of Evans's interaction with Khan, but the only reasonable inference from the facts is that Evans says that she pushed her emergency call button and radioed to the control center about Khan's overdose, leading to a response by several officers. It is also undisputed that Evans didn't have the ability to directly intervene by entering Khan's cell because she didn't have a key. Because Evans did what she could to respond to Khan's initial consumption of medication, no reasonable jury could conclude that she consciously disregarded the risk of harm to Khan. Therefore I will grant defendants' motion for summary judgment on Khan's claim against Evans, and I will deny Khan's motion for summary judgment on this claim.

### 3. Defendant Trostorff

I granted Khan leave to proceed on Eighth Amendment and Wisconsin-law negligence claims against defendant Trostorff, the control sergeant who responded to Evans's emergency call by sending support staff to the wrong unit.

Defendants concede that Trostorff initially directed staff to the wrong location: he told staff to support Evans on Foxtrot unit instead of Alpha unit. But Trostorff says that this was a mistake caused by the fact that Evans's emergency-button notification identified her as working on Foxtrot unit that night. After Lathrop radioed Trostorff to tell him that the incident was occurring on Alpha unit, Trostorff corrected the call to send support staff to Alpha unit. Defendants state that because Foxtrot and Alpha units are so close, the delay caused by Trostorff's incorrect instructions was no more than a minute.

Regarding Khan's Eighth Amendment claim against Trostorff, I take Khan to be saying that Trostorff deliberately sent the team to the wrong unit because Evans also radioed Trostorff with the cell number and Khan's name, which should have alerted Trostorff to the fact that the incident was occurring on Alpha unit. But Trostorff's failure to heed Evans's call does not raise a reasonable inference that he intentionally sent staff to the wrong unit. Immediately after defendant Lathrop told Trostorff that he had sent staff to the wrong unit, Trostorff called staff and redirected them to Alpha unit. The only reasonable inference from Trostorff's entire reaction to the emergency call is that he made a mistake in sending staff to Alpha unit. Because there is no reasonable inference that Trostorff consciously disregarded the risk of harm to Khan, I will grant summary judgment to defendants on the Eighth Amendment claim against Trostorff and I will deny Khan's motion for summary judgment on this claim.

As for Khan's state-law negligence claim against Trostorff, that must be dismissed because Khan failed to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.82. That statute provides that a claimant bringing a civil action against a state employee must serve written notice of the claim on Wisconsin's attorney general within 120 days of the event giving rise to the action. Wis. Stat. § 893.82(3). The notice must include the names of each state

employee involved. *Id.* The statute requires strict compliance. *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399, 227 Wis. 2d 100 (1999).

It is undisputed that the only notice of claim that Khan filed about these events was one postmarked June 14, 2021. Dkt. 72-1. But Khan filed the notice almost two years after his overdose, so it is untimely under the statute's 120-day deadline. And Khan sent the notice by first-class mail, not certified mail, which was the only approved method at the time of the events of this case. *Kelly v. Reyes*, 168 Wis. 2d 743, 744, 484 N.W.2d 388, 388 (Ct. App. 1992) (affirming dismissal of action where plaintiff used "regular mail, not certified mail to serve notice of his claim upon attorney general"); *Thomas v. Mashak*, No. 16-cv-496-bbc, 2017 WL 5195252, at *4 (W.D. Wis. Nov. 9, 2017), *aff'd*, 743 F. App'x 702 (7th Cir. 2018) (notice sent by first-class mail did not satisfy § 893.82). Because Khan failed to strictly comply with the notice-of-claim statute, I must dismiss his negligence claim against Trostorff.

### 4. Defendants Hoeper, Hanke, and Stilwell

Khan also supplemented his complaint to include Eighth Amendment claims against defendants Hoeper, Hanke, and Stilwell, who arrived at his cell in response to Trostorff's support call, but who did not immediately remove him and confiscate his medication, allowing him to swallow another handful of pills.

Hoeper says that he did not immediately remove Khan from his cell because when he spoke to him, Khan was calm and did not appear to be an immediate threat to himself. Hoeper adds that he didn't think that Khan had more pills in his cell, and that Khan didn't make any more threats to harm himself. Hoeper also says that his decision was influenced by the limited number of staff on hand overnight: if he thought that Khan was in immediate danger, he would have taken Khan out of the cell and placed him in restraints. But that type of intervention

would have "required more staff and therefore more strain on covering the rest of the institution." Dkt. 74, ¶ 12.

Khan doesn't materially dispute Hoeper's account and the video doesn't contradict Hoeper's account either. By the time Hoeper arrived at the cell, the threat appeared to be over; there is no evidence that Khan continued to threaten self-harm in Hoeper's presence. Hoeper's plan to keep Khan in his cell under the watch of Kimbler while he arranged for transport to the hospital did not prevent Khan from ingesting more pills, but it does show that Hoeper took the threat seriously and that he attempted to help Khan. Based on Hoeper's observation of Khan's calm demeanor and his efforts to transport Khan to the hospital, No reasonable jury could conclude that Hoeper consciously disregarded Khan's problem.

As for defendants Hanke and Stilwell, it is undisputed that they did not have the authority to remove Khan from his cell—that was Hoeper's decision to make—and that they had the same knowledge of the situation as Hoeper. Because I have already concluded that Hoeper did not consciously disregard the threat of harm to Khan, there isn't a basis to hold Hanke and Stilwell liable under an Eighth Amendment theory either.

### 5. Defendants Lathrop and Kimbler

Khan says that Lathrop and Kimbler failed to remove him from his cell and confiscate his medication, which allowed him to swallow two more handfuls of medication: one when Lathrop and Kimbler first arrived outside the vestibule before Hoeper's team arrived, and another after the vestibule door was opened and Hoeper left the area after speaking with Khan, leaving Kimbler to watch him. I take Khan to be saying that defendants should have entered the cell to restrain him or use pepper spray on him rather than allow him to swallow additional pills.

Because Lathrop eventually warned Khan that he would use force against him if he attempted to take any more medication, I will infer that Lathrop had the authority and ability to open the vestibule door and Khan's cell door if he thought it was necessary, even before Hoeper's team arrived. But Hoeper explains that at least several staff members would be used to extract an inmate; there isn't a reasonable inference that Lathrop or Kimbler consciously disregarded the problem by failing to rush into Khan's cell instead of waiting for the team to respond to the emergency call.

And as I stated regarding the claim against Hoeper, once Lathrop, Kimbler, and Hoeper entered the vestibule, the threat appeared to be over, with Khan sitting calmly and not continuing to threaten self-harm. Hoeper decided not to immediately extract Khan, but instead arrange for transportation to the hospital with Kimbler watching him in the interim. Khan says that Lathrop and Kimbler disregarded his problem because they were talking to each other rather than stopping him from taking more medication. But the video is clear that Kimbler continued to monitor Khan, and after Khan swallowed another handful of pills, Lathrop told Khan that he would have to use force against him if he tried to take more pills and Lathrop persuaded him to close the bottle. Lathrop and Kimbler stayed at the cell door, with Lathrop watching at the cell window for eight more minutes until the team returned. Those actions show that Lathrop and Kimbler did not consciously disregard the threat to Khan.

Despite Lathrop's and Kimbler's efforts, Khan did ingest more medication. Perhaps had they told Hoeper that Khan had swallowed more pills before his team arrived, Hoeper would have chosen to restrain Khan immediately. But this failure and the rest of Lathrop's and Kimbler's decisions at this point of the events would at most support a negligence claim, not an Eighth Amendment claim. Khan didn't bring negligence claims against these defendants and

even if he had, those claims would be dismissed because he failed to comply with Wisconsin's notice-of-claim statute. I will grant defendants' motion for summary judgment and deny Khan's cross motion for summary judgment on this aspect of Khan's claims.

## CONCLUSION

The only claim that survives summary judgment is Khan's Eighth Amendment claim against defendant Lathrop for ignoring his threat of self-harm as Lathrop conducted inmate count around midnight on July 30, 2019. I will direct the clerk of court to set a telephone conference with Magistrate Judge Stephen Crocker to set a new pretrial schedule and trial date for resolving the surviving Eighth Amendment claim against Lathrop. That schedule will include a hearing on prison officials' destruction of the hallway video.

## ORDER

IT IS ORDERED that:

1.  Plaintiff Amir J. Khan's motion for judicial notice, Dkt. 67, is DENIED.

2.  Plaintiff's motion for summary judgment, Dkt. 24, is DENIED.

3.  Defendants' motion for summary judgment, Dkt. 29, is DENIED with respect to plaintiff's Eighth Amendment claim against defendant Lathrop. The motion is GRANTED in all other respects.

4.  Defendants Evans, Kimbler, Hoeper, Hanky, Stilwell, and Trostorff are DISMISSED from the case.

5.  The clerk of court is directed to set a telephone conference before Magistrate Judge Stephen Crocker to set the schedule for the remainder of the proceedings in this lawsuit, including a hearing on prison officials' destruction of video of the Alpha unit hallway.

Entered September 30, 2021.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge